LISA BROWN,

     Plaintiff,

     v.

GEORGIA DEPARTMENT OF HUMAN
SERVICES DIVISION OF FAMILY AND
CHILDREN SERVICES and LISA C.
LARISCY, individually and in
her official capacity,

     Defendants.

CV 214-18

## ORDER

Plaintiff Lisa Brown brings suit against the Georgia Department of Human Services ("GDHS") Division of Family and Children Services ("DFCS") and Lisa C. Lariscy (collectively, "Defendants"). Plaintiff, an African-American, alleges that Defendants retaliated against her for complaining of racial discrimination, in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Civil Rights Act of 1866, 42 U.S.C. § 1984, by unlawfully: (1) demoting her; (2) transferring her; and (3) terminating her employment. See generally Dkt. No. 1 ("Compl."). Plaintiff contends that Defendants terminated her

employment after she filed a formal Equal Employment Opportunity Commission ("EEOC") charge.

Defendants responded by filing the instant Motion for Summary Judgment (Dkt. No. 43), arguing that: (1) Plaintiff cannot prove a prima facie case of retaliation; (2) Plaintiff's claims regarding her alleged demotion and reassignment are time-barred; and (3) Lariscy is entitled to assert the defense of qualified immunity and, thus, is not liable to Plaintiff in her individual capacity. Plaintiff opposes these contentions. See generally Dkt. No. 54.

The parties fully briefed the Motion, dkt. nos. 43, 54, 57, and it is now ripe for review. The Motion is **GRANTED** for the reasons set forth below.

## FACTUAL BACKGROUND[1]

### History of the Parties and Structure of GDHS

---

[1] Plaintiff's March 2009 demotion and October 1, 2009 reassignment claims are time-barred. The 42 U.S.C. § 1981 claims fall under Section 1981's four-year statute of limitations. Dkt. No. 54-1 at 55.

As to the Title VII claims, a charge of discrimination must be filed with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); see also Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001) ("For a charge to be timely in a non-deferral state such as Georgia, it must be filed within 180 days of the last discriminatory act."). Assuming that Plaintiff's April 5, 2010 Intake Questionnaire qualifies as a charge, any action occurring prior to **October 7, 2009**, is time-barred. See EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002) (per curiam) (applying statute of limitations because "[t]he alleged acts at issue . . . were discrete, one-time employment events that should have put the claimants on notice that a cause of action had accrued."); Beavers v. Am. Cast Iron Pipe Co., 975 F.2d 792, 796 (11th Cir. 1992) ("[A]llegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the [statute of limitations]." (quoting Gonzalez v. Firestone Tire & Rubber Co., 610 F.2d 241, 249 (5th Cir. 1980))).

Summary judgment is thus **GRANTED** as to Plaintiff's demotion and reassignment claims.

AO 72A
(Rev. 8/82)

In June 2007, the Liberty County Department of Family and Children Services ("LCDFCS") hired Plaintiff as office manager. Dkt. No. 43-7, 50:15-19. Plaintiff was responsible for handling employee leave, ordering and distributing supplies, "updating the internal control plan, [] attending outside meetings on behalf of [Richard] Chamberlin, [] paying the office expenses, [and] completing adpours."[2] Id. at 59:18-25. Plaintiff also reported computer issues to the IT specialist and supervised two receptionists (whom Plaintiff deemed the only front-desk staff), id. at 58:21-59:6, 60:13-61:1; her responsibilities did not include collecting mail. Id. at 60:22.

In November 2007, Richard Chamberlin, a Caucasian, became Plaintiff's supervisor when he was promoted to LCDFCS director. Dkt. No. 43-15, 12:13-24. He, in turn, reported to the regional Human Resources Director[3]—at the time, LeRoy Felder, an African-American. Dkt. Nos. 43-12, 34:3-11; 43-15, 51:17-53:16; 43-4, ¶¶ 2, 4. Lisa Lariscy, a Caucasian, replaced Felder in April 2009, dkt. no. 43-12, 26:17-25, becoming permanent that fall. Id. at 29:20-21. Her supervising regional human resources director became Dennis Burns, an African-American, beginning in July 2009. Dkt. No. 43-23, 15:22-16:9.

---

[2] Adpours are "documentation of invoices." Id.

[3] Responsible for "hiring and firing; compensation; consulting with County Directors and other managers about general personnel matters; responding to EEOC / GCEO [Georgia Commission on Equal Opportunity] charges; internal grievances; and external complaints from vendors or clients." Dkt. No. 43-4 ¶ 3.

AO 72A
(Rev. 8/82)

**Plaintiff's Performance in Liberty County**

Around September 10, 2008, Plaintiff received a Performance Management Evaluation ("PME"), completed by Chamberlin and reviewed by Felder. Dkt. No. 43-9 at 22-24. Plaintiff signed it, but took issue with its criticisms of her performance.[4] Shortly thereafter, Plaintiff complained to Felder about Chamberlin's use of a supplemental, unapproved Administrative Performance Survey. Dkt. No. 43-7, 168:7-169:11, 177:21-178:11. Plaintiff never complained about racial discrimination to Felder, and Felder discussed Plaintiff's concerns with Chamberlin. Dkt. No. 43-8, 167:13-171:20, 177:11-178:11.

**Leadership Changes at LCDFCS**

In January 2009, Felder learned that the Director of the McIntosh County Department of Children Services planned to retire. Dkt. No. 43-4 ¶¶ 10-14. Felder asked Chamberlin to serve as interim director there while remaining LCDFCS director. Id. ¶ 14. Multi-county directors, who enjoyed pay supplements, were common, given financial constraints. Id. ¶¶ 13, 17.

Chamberlin accepted on February 5. Id. ¶¶ 21, 23. He successfully requested Janice Collier's promotion to Plaintiff's direct supervisor, effective March 1. Dkt. Nos. 43-15, 60:5-61:18; 49-17 ¶ 4.

---

[4] Plaintiff "Met Expectations" regarding her work responsibilities. Id. at 24. However, as to "Statewide Responsibilities," she received a negative rating on teamwork and satisfactory ratings with regards to customer service, organizational commitment, and performance management. Id. at 22-23.

AO 72A
(Rev. 8/82)

**Plaintiff's Complaints**

**Adams' First Comment**

Plaintiff alleges that in early February 2009, Delores Bell Adams, a co-worker who neither supervised her work nor reviewed her performance, dkt. no. 43-7, 114:4-17, derogatorily called her a "redbone[5] ass heifer." Id. at 108:16-109:6. Plaintiff claims that she went to Chamberlain, who allegedly told her that, "as colleagues[,] [Plaintiff and Adams] need[ed] to try and get along and work the matter out." Id. at 113:13-17. Chamberlin denies that Plaintiff ever reported Adams' comment or other racial discrimination. Dkt. No. 43-15, 45:5-46:7.

On February 27, Plaintiff signed a copy of her Interim Progress Review, completed by Chamberlin and reviewed by Felder. Dkt. Nos. 43-9, pp. 25-26; 43-5, 109:7-113:5.[6]

**The Second Adams Incident**

Shortly thereafter, on March 13, Plaintiff walked into Adams' office to deliver some documents. Dkt. No. 43-7, 116:20-24. Adams "picked the papers up and slung them back towards [Plaintiff,] stating 'I am sick of this shit' . . . and . . . got up in a charging motion." Id. at 117:3-118:4. Plaintiff

---

[5] "Redbone" is a term used within the African-American community to describe African-Americans with light skin. See, e.g., JEFFRIANNE WILDER, COLOR STORIES: BLACK WOMEN AND COLORISM IN THE 21ST CENTURY 69 (2015), available at goo.gl/tsbI6X.
[6] Plaintiff "Met Expectations" in all categories, but Chamberlin explained that she needed to improve by "work[ing] collaboratively with colleagues and staff to provide program support throughout the office" and "[w]ork[ing] expediently to resolve and complete assignments." Id.

AO 72A
(Rev. 8/82)

emailed Chamberlin to complain, and when she did not hear back, emailed him again on March 17. Id. at 118:21-120:9.

On March 20, Chamberlin, Adams, and Plaintiff met to discuss the incident. Id. at 121:12-14. Adams never again insulted, or uttered a racially derogatory comment to, Plaintiff. Id. at 165:1. Chamberlin asked Plaintiff whether she was satisfied, and Plaintiff responded negatively, explaining that she wanted to relay her concerns to Felder. Id. at 121:15-125:8.

Plaintiff emailed Felder, requesting a meeting to discuss Chamberlin's leadership style. Id. at 151:21-153:10, 192:22-193:4. She did not explicitly set forth any racial concerns, because she wanted to discuss such "sensitive" issues in person. Dkt. Nos. 43-7, at 153:7-14; 49-17 ¶ 23. Lariscy, who replaced Felder, met with Plaintiff on April 9. Dkt. Nos. 43-6 at 29-33; 43-7, 160:17-22; 43-12, 26:18-29:25.

**Plaintiff's Complaints to OHRMD**

On June 22, Plaintiff filed a complaint with Isabel Blanco, DFCS Deputy Director, explaining that as a result of her complaints, she was subjected to harassment, unfair treatment, retaliation, and a hostile work environment. Dkt. No. 43-7, 176:20-177:25. The complaint did not mention racial discrimination. Id. at 177:18-20. Plaintiff assumed that "state agency staff would provide an honest, legitimate

investigation into her complaints and that her supervisors would truthfully inform any investigator of her complaints of Adams' racially derogatory comments." Dkt. No. 49-17 ¶¶ 31–32.

**Burns' Investigation**

In August 2009, Burns decided to investigate Plaintiff's retaliation claim (based on removal of her supervisory duties) and Lariscy's concerns regarding Chamberlin's leadership abilities. Dkt. Nos. 43-10 at 22; 43-23, 32:4–11. Burns denies receiving a race-discrimination allegation from Plaintiff. Dkt. Nos. 43-23, 42:21–45:2, 54:22–55:18, 59:20–61:20, 66:11, 105:16, 106:22–107:5. Plaintiff avers that Burns knew of this angle to her complaint because he expressed wanting to complete a "thorough assessment" to "avert the complaint going to the federal level," specifically, because it was a "Title VII complaint." Dkt. No. 43-17 at 11–12.

**The Results of Burns' Investigation**

In his August 19 report, Burns criticized both upper management and Plaintiff:

- Two major themes were revealed during this process: A) Leadership deficiencies with accountability, performance management and conflict management; B) Inappropriate interpersonal behaviors.

- [Plaintiff] has not been harassed nor retaliated against for reporting issues to upper management by [Collier] or [Chamberlin]. However, the administrative

AO 72A
(Rev. 8/82)

realignment of her position was handled inappropriately by [Chamberlin].

- There are issues with [Plaintiff's] performance and relationships with other staff members. However, these issues were not managed appropriately nor communicated to [Plaintiff] until the end of the performance management cycle. [Plaintiff] did not have the opportunity to address and correct performance deficiencies nor was she given specifics.

- There are significant issues with County Director, [Chamberlin's] style of leadership as evidence by his handling of incidents with the following staff: [Plaintiff], Patricia Stevens, and Matilda Adams. Chamberlin has not exercised parity with treatment of employees, doesn't confront issues head-on and has not fostered a high performing environment.

Dkt. No. 43-16 at 75-76.

Burns recommended a personnel shakeup:

- the "Regional Director should consider transitioning [Chamberlin] to the McIntosh County in an effort to focus and further develop him. The dysfunction at Liberty County is so strong that he would need to start fresh. We would not recommend the continuation of a multi-county status for [Chamberlin]."

- Paula Mungen should be promoted, because she was "overwhelmingly [] perceived as a knowledgeable and fair leader and it's my recommendation that she assume a greater leadership role at Liberty County (i.e. Acting County Director)."

- Plaintiff should work "under Mungen. [Chamberlin] trusts Collier explicitly and may ignore concerns from [Plaintiff] because

AO 72A
(Rev. 8/82)

she is perceived as being difficult to work with." Id. Burns noted that the relationship between Collier and [Plaintiff] was "damaged, unhealthy and has adverse consequences for the remainder of the staff. It is my feeling that this relationship cannot be repaired."

Id.

LCDFCS changed significantly, with Chamberlin demoted, dkt. no. 43-12, 51:13-18, 61:8-62:13, 92:3-6, and Mungen becoming director. Id. at 92:23-93:3.

**Impact of the Report on Plaintiff**

Soon after Burns's report, LCDCFS noted concerns with Plaintiff's work:

- Inability to recognize that your point is one of many, and there maybe of [sic] points of views that should be reviewed for use when making decisions.

- Poor follow-up and response to various projects.

- Perception of being difficult and unpredictable.

Dkt. No. 43-10 at 32. LCDCFS set forth expectations for Plaintiff's continued employment:

- Have positive engagement in person with a fellow member, in meetings and discussions or when you need to be critical of what is being said, do so in a constructive, yet pleasant way.

- When receiving a new project or task, you will ensure that you have all pertinent pieces of information by asking for

AO 72A
(Rev. 8/82)

clarification if you do not understand and by establishing a project timeline. Additionally, when responding to update requests, you will provide a detailed summary of exactly where you are with the project, thus nothing successful milestones and barriers to completion. You will refrain from comments like, "I have until Friday to complete." You will also transition from telling your supervisor you're going to be away from the office for 20 minutes to requesting to be away from office for 20 minutes as an example.

- Maintain a courteous, positive, and professional demeanor with clients, employees and the public.

- Maintain a courteous, positive, and professional demeanor in the presence of clients, the general public, and employees. Additionally, you can be more inviting by working with your door open (unless you're in a meeting or working on a time-sensitive project).

- Refrain from emotional outbursts in the workplace.

- Do not circumvent your supervisory chain by involving team members and other Liberty County staff with workplace concerns.

**Plaintiff's Reassignment**

Upon Chamberlin's demotion, DFCS offices in McIntosh and Glynn Counties were combined under the leadership of Semona Holmes, an African-American. Dkt. no. 43-12, 150:10-115:15. Holmes took charge of the Glynn office in early summer 2009, and of McIntosh in September. Dkt. Nos. 43-8, 218:1-219:23; 43-25, 15:21-16:19. She reported to Lariscy. Dkt. No. 43-25, 23:8.

AO 72A
(Rev. 8/82)

McIntosh did not have an office manager and Glynn's position was vacant. Id. at 11:3-25; 43-12, 153:4-25. Lariscy and Holmes noted each office's needs. Dkt. No. 43-12, 135:22-141:12. Lariscy alleges that there was a hiring freeze for administrative support positions. Id.

Lariscy reassigned Plaintiff to McIntosh with the approval of Burns and DFCS's Debra Keys. Dkt. Nos. 43-12, 132:5-133:22; 43-25, 11:3-24. Although Lariscy allegedly intimated that she had experienced some problems with Plaintiff, Lariscy told Holmes that she "[thought] that [Holmes would] work well with [Plaintiff] with [Holmes's] leadership style and . . . personality." Dkt. No. 43-25, 38:3-14.

On September 28, 2009, Lariscy informed Plaintiff that she would be reassigned as the McIntosh County office manager, effective October 1, pursuant to GDHS Human Resource/Personnel Policy #106.[7] Dkt. Nos. 43-8, 215:1-5; 43-10, p. 33 (Ex. 15). She also informed Plaintiff that Plaintiff would work under Holmes's supervision and that her reassignment occurred because McIntosh County needed an office manager. Id.[8]

---

[7] "Based on the needs of the Department, management has the authority to assign, take from, add to, . . . or otherwise change the duties and responsibilities of employees, and to direct and control their work. The assignment of duties and responsibilities may be temporary or permanent . . . Employees may be assigned from one duty station to another as a result of transfer, promotion, demotion, or relocation of function." Dkt. No. 43-10 at 39.

[8] The memorandum Lariscy gave Plaintiff states: "Managers and employees have a shared responsibility to ensure that the mission of the Department is accomplished. In order to accomplish this responsibility, managers have the

The next day, Plaintiff sent an email to Holmes, introducing herself and noting that she needed to use a day for annual leave. Dkt. No. 43-10 at 34. Plaintiff alleges that she was unaware that she would also work in the Glynn County office, eighteen miles further away, until she met with Holmes on October 4. Dkt. No. 49-17 ¶¶ 38, 39.[9] That day, Plaintiff and Holmes discussed Plaintiff's Performance Management Evaluation ("PMF") and duties, which included maintaining supplies and coordinating employee leave. Dkt. No. 43-8, 220:24-25. Plaintiff understood that she "would be in McIntosh three days a week, and [Holmes] left it at [her] discretion as to what days." Id. at 220:24-221:4. Plaintiff acknowledged that her "hours were from 8:00 to 5:00" and that she "would also man the front desk[,] and take mail to and from the post office[,] as well as meet with outside vendors in reference to our emergency plan and banking and inventory." Id. at 221:4-8.

When Plaintiff started, she supervised volunteer workers, dkt. nos. 43-7, 20:22-21:3; 43-25, 24:7-25, but alleges that she did not supervise front-desk staff until February 1, 2010. Dkt. No. 49-17 ¶ 43. Her PMF had a "not applicable" mark for supervisory duties. Dkt. No. 43-9 at 34. However, according to Holmes, Plaintiff had duties that "weren't necessarily specified

authority to reassess and/or re-locate employees at any time." Dkt. No. 43-10 at 33.
[9] Multi-county employees were assigned to a specific county for accounting purposes. Dkt. No. 43-21, 34:18-23.

AO 72A
(Rev. 8/82)

or clearly outlined," dkt. no. 43-25, 51:4-16, including supervising front-desk staff. Said staffers received applications and distributed forms to clients, and they were assisted by the entire office. Dkt. No. 43-25, 15:21-16:19, 21:17-24:25, 28:5-23, 51:4-15.

**January 2010 Issues**

In January 2010, following a negative front-desk work evaluation for Glynn County, Regional Manager Jacqueline Bryant devised an office restructuring plan. Dkt. No. 43-12, 156:14-159:17. On January 22, Plaintiff attended a meeting with Bryant and Economic Support Supervisor Lisa Bessett to discuss changes to her duties, effective February 1, 2010: (1) supervise the Glynn County front desk/registration staff; (2) work Monday, Wednesday, and Friday in Glynn County, and Tuesday and Thursday in McIntosh County; (3) take outgoing mail to the post office on her scheduled days in Glynn County; and (4) perform some front-desk duties. Dkt. No. 43-8, 229:17-231:11; 43-10 at 42.

Bessett offered to be available for help, Plaintiff was sent to registration training, Bryant arranged for the Chatham County Office Manager to "shadow" Plaintiff, and Bryant arranged for Liberty County staff to assist Plaintiff with registrations. Dkt. No. 43-8, 229:17-231:11; 43-10 at 42.

AO 72A
(Rev. 8/82)

Bryant wrote a memorandum confirming the changes, and Bessett sent an email to Plaintiff and her staff about the new expectations. Dkt. Nos. 43-8, 229:17-231:11; 43-10 at 42.

Lariscy believed that Plaintiff's prior experience supervising front-desk staff in Liberty County qualified her to supervise. Dkt. No. 43-12, 160:9-15. Bryant allegedly delegated a partial front-desk supervisory role to Plaintiff. Dkt. No. 43-12, 159:8-11. Plaintiff maintains that she began to supervise all of the front-desk staff. Dkt. Nos. 43-8, 221:15-20, 231:17-12; 43-10 at 42 (Ex. 19). She further claims that she was ill-prepared, given that she had only ever supervised receptionists. Dkt. Nos. 49-17 ¶ 40; 43-7, 60:24-61:7.[10]

In mid-January 2010, Holmes resigned. Dkt. No. 43-25, 38:19-41:22. She had given Plaintiff an unofficial performance review indicating that she "Met Expectations." Dkt. Nos. 43-8, 227:4-228:16; 43-10 at 41; 43-25, 61:17-63-24. Holmes told Plaintiff that "it [was] not an official copy." Dkt. No. 49-17 ¶ 74. Lariscy reviewed the evaluation and returned it to Holmes for corrections, but Holmes made none. Dkt. No. 43-20 at 38. Lariscy allegedly sent the incomplete evaluation to Petula Gomillion, an interim Liberty County director who did not know Plaintiff, for a "re-do." Dkt. No. 49-18 ¶¶ 3, 5, 8.

---

[10] Plaintiff further alleges that "[t]hese responsibilities were not substituted for my prior responsibilities; rather, they were loaded on top of what I already was doing." Dkt. No. 49-17 ¶ 40.

AO 72A
(Rev. 8/82)

Effective February 1, 2010, Beth Griffis, a Caucasian, became interim director for McIntosh and Glynn counties, and thus Plaintiff's immediate supervisor. Dkt. Nos. 43-8, 231:17–232:25, 245:4-10; 43-12, 154:22-155:12; 43-18, 13:5-25.

**Plaintiff's Requests for a Salary Supplement and Rental Car**

Back when Plaintiff first began working in Glynn and McIntosh, Holmes suggested that she request a multi-county salary supplement; Lariscy denied Plaintiff's request. Dkt. No. 49-17 ¶ 49. According to both Griffis and Beverly Boone, a regional human resource manager, a supplement was only approved when an employee's duties significantly surpassed her normal day-to-day responsibilities and job description. Dkt. Nos. 43-19, 133:9-136:23; 43-21, 11:4-12, 46:5-58:7, 81:12-87:12, 115:16-118:18.[11] DFCS did not reimburse employees for travel from their homes to their offices, and those who used rental cars had to deduct personal miles. Dkt. No. 43-21, 36:24-45:17.

Lariscy allegedly told Holmes that if a salary supplement were approved for Plaintiff, it would need to be approved for every multi-county employee, which would be unfeasible. Dkt. No. 43-25, 26:2-21.[12] Holmes explained that while "pretty much everyone that worked for Glynn County was available for

---

[11] Boone stated that the only employees who automatically received the supplement were multi-county directors. Dkt. No. 43-21, 50:8-51:21.
[12] An employee would submit a supplement request to a supervisor; it would then progress up the chain to OHRMD. Dkt. No. 43-21, 58:2-59:3. The claim could be stopped at any point and approval depended on "the specifics of the actual circumstances." Dkt. No. 43-21, 57:7-12.

AO 72A
(Rev. 8/82)

McIntosh," none of these received a supplement. Id. Plaintiff responds that not every employee who worked for Glynn was also available to work for McIntosh. Dkt. No. 49-17 ¶ 48.

On March 19, 2010, Plaintiff spoke to Griffis about requesting both a salary supplement and a rental car. Dkt. Nos. 43-8, 242:6-247:23; 43-10 at 44. Plaintiff had heard that Griffis had approved a rental car for a social-service case manager. Dkt. No. 49-17 ¶¶ 51—52. Griffis allegedly informed Plaintiff that she used a rental car to preserve miles on her personal vehicle, even offering Plaintiff its use for post office runs. Id. ¶ 51.

On March 29, Plaintiff asked Griffis if she had spoken with Lariscy. Dkt. No. 43-10 at 44. Griffis replied that she could not request the supplement because of staffing realities:

> Many workers are working both Glynn and
> McIntosh at this point as we have combined
> the counties. Staff are being compensated
> for the travel expenses between their home
> county and the other. Your PMF that you
> signed reflect that you are assigned as
> office manager for both counties and this
> arrangement was reached before my assignment
> in Glynn/McIntosh.

Dkt. Nos. 43-8, 242:6-244:13; 43-10 at 46.

According to Boone, Plaintiff was not eligible for a supplement because her duties did not go beyond those of an office manager. Dkt. No. 43-21, 81:16-87:10, 115:20-117:2.

AO 72A
(Rev. 8/82)

Plaintiff does not know why her request for a rental car was denied. Dkt. Nos. 43-8, 242:6-244:21. She was reimbursed for travel between her home office, McIntosh County, and Glynn County; trips to the post office to get DFCS mail; and travel to training. Dkt. No. 43-8, 236:4-237:23, 244:4-20, 248:2-249:17. Plaintiff alleges that after her requests were denied, Griffis displayed "a strange attitude towards [her]." Id. at 245:4-247:8; 43-10 at 64.

**Griffis' Problems with Plaintiff**

When Griffis began, she was allegedly unaware of the perception of Plaintiff as a challenging employee, given that Lariscy described Plaintiff as an experienced office manager. Dkt. No. 43-18, 33:20-34:22. Griffis was also unaware of any complaints of race discrimination by Plaintiff. Id. at 127:13-132:7. Griffis assumed that Plaintiff could handle her job duties, but she soon noticed problems. Id. at 56:12, 61:3-69:3.

Griffis claims that Plaintiff failed to: (1) register Office of Family Independence ("OFI") applications because she delegated that responsibility to others, id. at 44:23-45:6; 43-10 at 54-57; (2) timely submit a plan of action addressing a front-desk deficiency in processing OFI applications, id. at 60:20-61:25; 43-20 at 33; 43-10 at 52; (3) help other employees, because she stayed in her office with her door closed, dkt. no. 43-18, 45:11-15; (4) tell Griffis which office she was going to,

AO 72A
(Rev. 8/82)

instead of seeking her input, id. at 42:14-43:1; 43-8, 272:10-15; 43-10 at 54-57; (5) retrieve mail on one occasion and to distribute mail correctly, dkt. nos. 43-18, 41:10-12, 52:3-25, 138:4-25; 43-20; (6) accurately complete time sheets, id. at 41:19-24; 43-10 at 54-57; (7) remain for the duration of a special training, dkt. nos. 43-18, 41:25-42:12, 53:21-55:12; 43-10 at 54-57; and (8) appropriately use her leave, dkt. nos. 43-19, 92:5-97:15; 43-10 at 54-63.

Griffis also maintains that Plaintiff had a history of being out on Mondays, requested sick leave at the last minute after being told that she could not take annual leave unless her work was completed, and scheduled a doctor's appointment in conflict with an Emergency Preparedness Meeting. Dkt. Nos. 43-20, 150:8-153:17; 43-10 at 54-63.

Griffis tried to rectify these problems, dkt. no. 43-18, 61:13-14, but claims that Plaintiff was hostile and unreceptive. Id. at 61:13-21.

Plaintiff responds that her immediate staff had no complaints. See Dkt. Nos. 49-23, 31:21-34:9; 49-25, 54:5-57:16; 49-22, 14:4-17, 17:15-20. She says that she sent a detailed action "plan," not learning that Griffis considered it "inadequate" until later. Dkt. No. 49-17 ¶¶ 63-64. Plaintiff also noted that any deficiencies in front-desk supervision could

AO 72A
(Rev. 8/82)

not be attributed to her because she did not have a front-desk supervisory role until February 1, 2010. _Id._ ¶ 63.

She believed from her prior work with Holmes and from her memorandum that she should independently set her schedule in light of office needs. Dkt. No. 43-10 at 42. Following Griffis' displeasure, Plaintiff never left the office again without first informing her. Dkt. No. 49-17 ¶¶ 57, 71.

Plaintiff only heard of one mail complaint, when her assistant was ill, _id._ ¶ 65, and she maintains that a co-worker interfered with her mail duties. _Id._ ¶ 66. She never received any timesheet complaints from employees. _Id._ ¶ 67; 49-23, 31:21-34:9; 49-25, 54:5-57:16; 49-22, 14:4-17, 17:15-20.

Plaintiff claims that Griffis did not arrange special training for her, as the training in question was regional. Dkt. No. 49-17 ¶ 68. She acknowledges that she left for fifteen minutes to use the restroom, but says she returned for the remainder and explained her absence to the speaker. _Id._

She says that she used leave because she was experiencing "temporary but serious health issues." _Id._ ¶ 69.

Plaintiff alleges that Griffis merely asked Plaintiff to ensure that someone from the office attend the emergency planning meeting. _Id._ ¶ 70.

AO 72A
(Rev. 8/82)

**Griffis Complains about Plaintiff**

Griffis notified Lariscy that she was having problems with Plaintiff's performance and Lariscy directed her to voice her concerns with the Office of Human Resource Management Division ("OHRMD"). Dkt. No. 43-18, 49:21-50:14, 67:21, 71:3-9. Accordingly, on April 1, 2010, Griffis emailed Burns. Dkt. No. 43-20 at 35-36. Burns explained that Plaintiff had exhibited a number of the issues Griffis complained of while working at Liberty County, and that Lariscy had met with her. Id. Burns noted that since Plaintiff's problems were repetitive, she would receive a written reprimand. Id.

On April 9, 2010, Besset took over Plaintiff's front-desk supervisory duties and assumed a supervisory role over Plaintiff. Dkt. Nos. 43-8, 282:13-283:17; 43-20 at 37-40. Plaintiff had yet to receive any written corrective or disciplinary action, dkt. no. 49-17 ¶ 72; moreover, she never received any report for the year 2010. Id.

In an email exchange beginning on April 12 and ending on April 13, Griffis sent Burns supporting documentation and a memorandum. Dkt. Nos. 43-20 at 37-40; 43-10 at 54-57. Burns requested that Griffis send Plaintiff's interim review. Id. Griffis alleges that she could only find an unexecuted draft and that Holmes could not remember if she completed Plaintiff's review. Dkt. Nos. 43-18, 48:19-51:20; 43-19, 84:21-85:12; 43-20

at 37; 43-8, 287:4-288:15. Lariscy told Griffis that she sent the review back to Holmes for corrections, but Holmes failed to complete them before her resignation. Dkt. No. 43-20 at 38.

Griffis reported the lack of a finalized interim review, and Burns responded on April 13 at 3:09 p.m., with instructions:

> Please complete the review from the time that she transferred to Glynn up until the present. You can use some of the qualitative/quantitative information that you agree with from [Holmes] during her oversight period; and then add your input with special attention to the performance deficiencies that you have noticed and have documentation to support.
>
> Please have Jackie Bryant, and whomever else in a supervisory capacity provide you with information as well - if they have observed performance. You'll need to have an inclusive - well-rounded approach when providing feedback to this employee.
>
> Please confirm that she received expectations upon arrival to Glynn.
>
> This MRF will document all of the issues that you presented to me in a previous e-mail.

Dkt. No. 43-20 at 37.

Griffis drafted an interim review on April 14. _Id._ at 41–44. It gave Plaintiff low ratings and noted the issues of which Griffis complained. _Id._ Plaintiff alleges that Griffis did not use any positive information from Holmes' review. Dkt. No. 43-19, 85:21. Griffis claims that she drafted the report alone, without the aid of Lariscy or Burns, dkt. no. 43-18, 50:24–

AO 72A
(Rev. 8/82)

51:20, but Plaintiff argues that emails between Lariscy and Griffis show otherwise, dkt. no. 49-10 at 2-15. Plaintiff stated that she did not receive a copy of the interim report until after she was fired, and that it was unofficial because it was never signed or executed. Dkt. No. 43-8, 285:17-288:15.

**Internal Complaint**

On April 5, Plaintiff used sick leave for a medical appointment; she also visited the EEOC to file a complaint. Id. at 258:5-20. Plaintiff did not tell anyone that she completed an EEOC Intake Questionnaire. Id. On April 13, Plaintiff emailed Blanco, copying Commissioner B.J. Walker and Assistant Commissioner Mark Washington, notifying them that she had filed an EEOC retaliation complaint. Id. at 278:20-280:20; Dkt. No. 43-20 at 45-46. Plaintiff did not send a copy of that email to Griffis, Burns, or Lariscy, and they allege that they were never aware of it. Id.; Dkt. Nos. 43-23, 105:20; 43-19, 121:17-122:5, 129:9-130:15; 43-12, 74:4-20, 113:6-18.

Plaintiff contends that Lariscy, Burns and Griffis were aware of her EEOC complaint because: (1) Plaintiff emailed Blanco at 4:23 p.m. on April 13 and at 4:35 p.m., the email was forwarded to Rosa Waymon (Burns' supervisor), dkt. no. 43-10 at 64; (2) Burns then sent an email to Griffis asking to speak to her, dkt. no. 43-24 at 30; (3) Plaintiff told Griffis on April 16 that she "wanted [documents] to submit to the EEOC," dkt. no.

43-8, 294:5-295:14; and (4) Griffis emailed Lariscy that day of a report from an employee that Plaintiff "was gathering information to prove" discrimination. Dkt. No. 43-11 at 22.

**The Enterprise Incident**

On April 12 or April 14, Plaintiff contacted Enterprise Rent-A-Car (a DFCS contractor), stating that she was an office manager and wanted receipts for Griffis, Chamberlin, and another supervisor, Laurie Morton. Dkt. Nos. 43-8, 292:5-293:24; 43-10 at 71; 43-21, 36:15-24. Plaintiff says that she did so "for the sole purpose of getting documentation to support [her] discrimination/retaliation charge." Dkt. No. 49-17 ¶ 81. On April 15, Griffis emailed Burns about the incident:

> I just received a telephone call from the manager of the Kingsland Georgia Enterprise Vehicle Rental Chain. She called to tell me that she felt uncomfortable about a DFCS employee calling her repeatedly for the past two days insistent on getting copies of mine and Laurie Morton's car rental agreements. She advised me that this person identified herself as [Plaintiff], Office manager of DFCS and represented to her that she needed these copies to process [sic]. The manager stated that she called during very busy times but [Plaintiff] presented like this was something she had to have at the moment. She requested agreements be sent to two different FAX numbers which the manager thought was strange. [Plaintiff] has nothing whatsoever to do with this process, especially since mine and Ms. Morton's positions are Camden County. These calls were obviously a misrepresentation of DFCS business. Also, I have heard from Lisa Besset this afternoon that [Plaintiff] had

> [Chamberlin's] rental agreements faxed to
> her at the McIntosh office.

Dkt. No. 43-11 at 22.

The next day, Plaintiff requested Family Medical Leave Act ("FMLA") leave, effective from April 19 to May 5. Id. at 2-3.

On April 16, Burns directed Griffis to contact Plaintiff about the Enterprise incident because he needed a signed statement from her, in addition to a statement from the person at Enterprise who contacted her. Id. at 22. Burns requested that Griffis fax him copies of the documents Enterprise sent to Plaintiff, along with Griffis' interim review of Plaintiff. Id. Griffis replied later that day, explaining that she called Plaintiff at home and Plaintiff admitted to calling Enterprise to obtain rental car agreements. Id.; Dkt. No. 49-17 ¶ 82. Griffis told Burns that Plaintiff informed her that she was gathering evidence of discrimination, allegedly threatening that was the least of Griffis' problems and that Griffis would find out what she meant. Dkt. No. 43-24 at 35.[13]

---

[13] In the same email, Griffis explained her privacy concerns:

> I am not worried about [Plaintiff's] cause. I have done nothing wrong and stand behind my work and work action. What I am worried about is her gathering my personal information for a vendor by misrepresenting herself using her job title to get it. This is very upsetting to me. I obviously do not trust her with my personal information. I feel this is a breach of confidentiality and fraudulent. I feel this should be dealt swiftly with some action taken and not left on hold until she returns to work. Thanks.

Id. at 22.

AO 72A
(Rev. 8/82)

Plaintiff claims that she told Griffis and Morton that she was taking the documents to the EEOC, dkt. no. 49-17 ¶ 83, and that she only gave information from them to the EEOC investigator and, later, her attorney. Dkt. No. 43-8, 294:13-295:10. Plaintiff said that she apologized to Morton and told her that she would shred any document with confidential information because she was not trying to commit identity theft. Id. at 297:1-301:5. Defendants never requested or obtained a signed statement from Plaintiff. Dkt. No. 49-17 ¶ 82.

Griffis claims that this incident was the "straw that broke the camel's back." Dkt. No. 43-18, 62:9-12. She recommended termination. Id. at 48:6-52:2, 66:3-17; 43-19, 80:2-81:19. According to Lariscy, she wanted to terminate Plaintiff because her behavior "was significantly egregious conduct by a state employee." Dkt. No. 43-13, 208:20-24.[14]

---

[14] Boone stated that Plaintiff's phone call to Enterprise violated GDHS Standards of Conduct and Ethics, which Plaintiff signed. Dkt. Nos. 43-21, 119:12-125:25; 43-10 at 8-21; 43-9 at 6-9. The policy states:

> All employees of the [GDHS] are expected to maintain and exercise at all times the highest moral and ethical standards in carrying out their responsibilities and functions. Employees must conduct themselves in a manner that prevents all forms of impropriety, placement of self-interest above public interest, partiality, prejudice, threats, favoritism and undue influence.
>
> Employees must be alert in conducting business with employees and non-employees to avoid even the appearance of misconduct, personal or financial gain or conflict of interest. While performing departmental duties, employees are required to comply with . . . the Code of Ethics for Government Services, the Governor's Executive Order . . . and Rules of the State Personnel Board and Department policies.

Lariscy and Griffis agreed that the basis for Plaintiff's termination was the report of Plaintiff's misrepresentation to Enterprise that she needed the records for payment when she had no job-related reason to obtain them. Dkt. Nos. 43-12, 114:11-118:10; 43-18, 62:9-12, 68:10-25; 43-19, 102:12-108:9.

On April 16, Lariscy emailed Burns to recommend termination. Dkt. No. 43-11 at 22.[15] Burns responded that he could not advise without the requested documentation. <u>Id.</u> Griffis claims that she sent the documents and a "statement of events" to Burns, <u>id.</u>; dkt. no. 43-10 at 71, but Plaintiff alleges that they were not produced. Dkt. No. 50-2 ¶ 169.

Plaintiff contends that Griffis and Lariscy had in fact recommended her termination in March, long before the Enterprise incident, dkt. nos. 43-18, 65:13-66:17; 43-19, 80:12-81:19, and that during her phone call to Enterprise, she did not claim to need the records to process payment. Dkt. No. 49-17 ¶ 84. She

Dkt. Nos. 43-21, 119:10-131:24; 43-11 at 8-21 (parentheticals omitted). Boone testified that when an infraction is particularly egregious, immediate dismissal could be warranted. Dkt. No. 43-21, 130:21-131:24.

[15] "Not only do I see [Plaintiff's] work performance as a significant issue, but I am very concerned about the threat that [Plaintiff] made to [Griffis] this a.m. and see this situation only escalating if [Plaintiff] is allowed to return. In my opinion, [Plaintiff] has created a hostile working environment by threatening [Griffis]. To my knowledge, [Griffis] has done nothing wrong and has actually been the first County Director to deal appropriately with [Brown] in trying to hold her accountable. Based on what [Griffis] has stated to me the information that Enterprise faxed to [Plaintiff] has [Griffis'] personal information such as social security number on it. I know that we have to be fair with all staff but at this point, [Griffis] needs to be supported by the Division as well and by allowing [Brown] to return to work I do not believe this shows our support for a solidly performing employee who is managing three counties. Georgia is an at will employer and as such I think when we have these types of situations we need to balance out all employees' interests and rights. Please let me know OHRMD's thoughts on this matter." <u>Id.</u>

avers that the document she received did not contain Griffis' social security number, credit card number, or driver's license number. Dkt. No. 43-11 at 22.

Plaintiff acknowledged that her employment was "at will" and that she could be "separated at any time without notice or statement of reasons." Dkt. Nos. 43-7, 54:15-55:17; 43-9 at 7.

**Request for Donated Leave**

Plaintiff argues that she was denied the opportunity to apply for donated leave. Dkt. No. 43-8, 303:4-6. Plaintiff testified that she requested a donated leave form from Telisha Mack, but the paperwork was never sent to her. Id. at 302:18-306:14. Mack, a Financial Operations Generalist for Region XII Accounting, forwarded Plaintiff's leave request to Burns, asking how to respond. Dkt. No. 43-11 at 33. Burns responded that "[G]DHS Donated Leave Policy provides that in order to solicit and use leave donations, an employee must be on approved leave without pay for 80 consecutive hours and have exhausted all annual, personal, sick, and forfeited leave and compensatory time." Dkt. Nos. 43-8, 302:18-306:14; 43-11 at 33.

Boone says that donated-leave forms were easily accessible online. Dkt. No. 43-21, 98:13-20. Defendants contend that Plaintiff admitted to knowing that she was ineligible at the time of her request. Dkt. No. 43-8, 303:4-304:8.

AO 72A
(Rev. 8/82)

**Plaintiff's Termination**

On May 4, 2010, Lariscy told Griffis that both she and OHRMD had approved Plaintiff's termination. Dkt. No. 43-20 at 48. Lariscy did so on April 16. Dkt. No. 43-11 at 22. Burns allegedly informed her that she could not terminate Plaintiff until Plaintiff returned from her FMLA leave, for fear of giving the wrong impression. Dkt. Nos. 43-19, 112:20-113:11, 118:9-12; Dkt. No. 43-23, 118:8-119:10. Burns also testified that neither Lariscy nor Griffis pressured him to approve Plaintiff's termination. Id. at 120:22-121:1, 127:20-128:1. Lariscy terminated Plaintiff in collaboration with Griffis, Burns, Waymon, and Gary Nagel at OHRMD. Dkt. No. 43-12, 88:9-89:23, 118:4-9, 208:3-210:18.

Directed by Burns, Griffis called Plaintiff on May 5 to notify Plaintiff that she was being terminated. Dkt. Nos. 43-19, 113:3-114:19; 43-8, 307:11-308:17. Via a letter with the same date, OHRMD terminated Plaintiff. Dkt. No. 43-8, 307:11-308:17; 43-11 at 34. Burns drafted Plaintiff's termination letter and Griffis signed it. Dkt. No. 43-19, 109:14-110:6.

Lariscy retired on July 1. Dkt. No. 43-6 ¶ 3.

**EEOC Charges**

On July 14, 2010, Plaintiff filed a charge with the Georgia Commission on Equal Opportunity ("GCEO"), alleging that she was terminated on the basis of race discrimination and retaliation.

Dkt. No. 43-11 at 37-45. On August 4, 2010 GDHS received notice. Id. That notification stated that GCEO dismissed the charge and relinquished jurisdiction to the EEOC for investigation. Id. On November 1, 2010 Plaintiff received an EEOC Notice of Right to Sue. Id.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the

AO 72A
(Rev. 8/82)

court that there is an absence of evidence to support the nonmoving party's case. Id. at 325.

If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257. The nonmovant may satisfy this burden in two ways: First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex, 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.

## DISCUSSION

Plaintiff alleges that Defendants retaliated after she complained about racial discrimination by denying her a subsidy after transferring her job duties to a different office, causing her to drive 114 miles roundtrip; drafting a false performance review; denying her sick-leave requests; assigning her excessive work for which she had no training; terminating her employment

while she was on approved FMLA leave; and terminating her after she filed an EEOC Complaint. See generally Compl.

I. **Plaintiff Fails to Set Forth a Prima Facie Case of Retaliation**

Plaintiff asserts a retaliation claim under 42 U.S.C. § 2000e-3(a)(1) ("Title VII") and 42 U.S.C. § 1981. Title VII and Section 1981 "have the same requirements of proof and use the same analytical framework." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Therefore, the Court will "explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." Id.

Given that Plaintiff relies on circumstantial evidence, this case is governed by the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010).

"Title VII protects employees against retaliation by an employer for participation in an employment discrimination case." Donnellon v. Freuhauf Corp., 794 F.2d 598, 600 (11th Cir. 1986). To establish a retaliation claim, Plaintiff must prove that (a) she engaged in statutorily protected activity, (b) she suffered a materially adverse action, and (c) there was a casual relation between the protected activity and the adverse action. Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1212-13

AO 72A
(Rev. 8/82)

(11th Cir. 2008) (quoting Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008)).

After the plaintiff establishes a prima facie case, the employer may present a legitimate, non-retaliatory reason for the action. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) (citing Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)).

If it does so, then "[t]he ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." Id.

## A. Plaintiff Engaged in Statutorily Protected Activity

There are two categories of statutorily protected activities. The Participation Clause protects individuals who have filed EEOC charges. 42 U.S.C. § 2000e-3(1); EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000). The Opposition Clause protects activity prior to that point, such as filing an internal complaint or informally complaining to a supervisor. 42 U.S.C. § 2000e-3(a); Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001) (citing Rollins v. Fla. Dep't of Law Enf't, 868 F.2d 397, 400 (11th Cir. 1989)). A plaintiff engaging in a protected activity must, "'at the very least, communicate her belief that discrimination is occurring to the employer,' and cannot rely on the employer to 'infer that

discrimination has occurred.'" Demers v. Adams Homes of Nw. Fla., Inc., 321 F. App'x 847, 852 (11th Cir. 2009) (quoting Wedd v. R&B Holding Co., 992 F. Supp. 1382, 1390 (S.D. Fla. 1998)).

Plaintiff argues that she engaged in Participation Clause activity when she visited the EEOC and completed an Intake Questionnaire. Dkt. Nos. 49-13 at 2-4; 54 at 9-10. The Court agrees. Cf. Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1321 (11th Cir. 2001) (holding that Intake Questionnaire can be a formal EEOC charge for purposes of statute of limitations). The Participation Clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC." Total Sys. Servs., Inc., 221 F.3d at 1174; see also Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir. 1978) (explaining that "participation in the machinery set up by Title VII to enforce its provisions" is protected). It is enough for an employee to "instigate proceedings." Total Sys. Servs., Inc., 221 F.3d at 1174 n.2; see also 42 U.S.C.A. § 2000e-3 (protecting "participat[ing] in any manner in an investigation[ or] proceeding").

Plaintiff selected "Box 2," which states, "I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above." Dkt. No. 49-13 at 4. This brought her within the Participation Clause's ambit. See Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th

Cir. 1998) ("Participatory activities are vigorously protected to ensure employees' continuing access to the EEOC and the enforcement process."); Richardson v. Horry Cty., Civ. A. No. 4:05-2086, 2008 WL 906559, at *10 (D.S.C. Mar. 31, 2008) (explaining that filing an Intake Questionnaire is protected); cf. Kaplan v. City of Arlington, 184 F. Supp. 2d 553, 564 (N.D. Tex. 2002) (observing that filing a state intake questionnaire can constitute protected behavior). The first prong of Plaintiff's prima facie case is satisfied as to the Participation Clause.

It is not satisfied as to the Opposition Clause. Plaintiff argues that Defendants retaliated against her by demoting her and reassigning her to a different county. Dkt. No. 54 at 10-14. The Opposition Clause makes it unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Subchapter VI], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Subchapter VI]." 42 U.S.C. § 2000e-3(a).

Plaintiff argues that she

> complained both of her co-worker's hostile,
> humiliating racial slur directed squarely at
> her and about the failure of her supervisor
> and then her supervisor's supervisor to do
> anything about it. And in late March when
> her supervisory responsibilities were
> removed without explanation less than two

AO 72A
(Rev. 8/82)

> months from the date of her complaint,
> [Plaintiff] additionally complained about
> retaliation she perceived in response to her
> complaint of the co-worker's racial slur.

Dkt. No. 54 at 11.

The actions cited by Plaintiff are time-barred. See supra at 2 n.1. The Court will not equitably toll the statute of limitations on the ground that Plaintiff relied on Defendants' internal investigation. See Dkt. No. 54 at 22 (complaining that Defendants "lulled [Plaintiff] into believing that her complaints were being properly addressed"). Plaintiff's reliance on Defendants' internal investigation plainly shows that "Defendants made no misrepresentations that hindered [her] from learning of [their alleged] discrimination against her." Howard v. Intown Suites Mgmt., Inc., No. 1:04-CV-759, 2006 WL 739168, at *2 (N.D. Ga. Mar. 17, 2006).

Plaintiff could attempt to save her Opposition Clause claim by leaning on other supposed wrongdoing, such as the denial of her request for a subsidy, the drafting of a false performance memorandum, the denial of her sick leave request, or the assignment of excessive work for which she had no training. See generally Compl. But she needs to show "that [s]he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997).

AO 72A
(Rev. 8/82)

She cannot do so. Her complaint of racial discrimination—the event that allegedly triggered retaliation—occurred approximately one year before any of those events.[16] The record is devoid of evidence that Plaintiff believed that Defendants' actions were due to her previous complaint of racial discrimination, motivated by racial animus, or the results of her complaints to management. Thus, Plaintiff could not reasonably believe that she was still suffering from opposing an unlawful practice a year before the incidents in question. See Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (observing, in finding a three-month delay to be too great to infer retaliation: "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.").

Plaintiff may not agree with the decisions Defendants made, but the Court's "sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999). It did not. There is no evidence supporting Plaintiff's allegations. Accordingly, summary judgment is **GRANTED** as to Plaintiff's Opposition Clause claim.

---

[16] Plaintiff immediately complained about Adams' insult and the subsequent March incident to management and continued to complain when she felt that her concerns were not adequately addressed.

AO 72A
(Rev. 8/82)

**B. Plaintiff Suffered a Materially Adverse Employment Action**

"An action is materially adverse if it 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1259 (11th Cir. 2012) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Plaintiff's employment was terminated. This prong is established.

**C. Intervening Misconduct Broke the Causal Link between Plaintiff's Protected Act and Her Termination**

But-for causation is required in Title VII retaliation claims. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013). A plaintiff must both "provide sufficient evidence that the decision-maker had knowledge of the protected activity," Vignoli v. Clifton Apartments, Inc., No. 12-24508-CIV, 2014 WL 6850775, at *7 (S.D. Fla. Oct. 7, 2014) (citing Higdon, 393 F.3d at 1220), and show "close temporal proximity between the statutorily protected activity and the adverse employment action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (noting that "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint fails as a matter of law"). "[M]ere temporal proximity, without more, must be 'very close.'" Id.

AO 72A
(Rev. 8/82)

Defendants were aware of Plaintiff's protected activity. Plaintiff sent an email to GDHS Commissioners Blanco, Washington, and Walker on April 13, 2010, in which she stated that she had "filed a complaint with the EEOC." Dkt. No. 43-20 at 46. This, even by itself, was sufficient to make a decision-maker "aware" of Plaintiff's protected activity.

Even were it not, Defendants expect the Court to believe that since Plaintiff did not send the email to Burns, Lariscy, or Griffis, they were unaware of her complaint. Dkt. No. 43-1 at 19. Based on the evidence presented, a reasonable juror could find this argument to be implausible. See Hales v. First Appalachian Corp., 494 F. Supp. 330, 333 (N.D. Ala. 1980) ("The court may disregard evidence that is too incredible to be believed."). Blanco, Walker, and Washington supervise Burns, Lariscy, and Griffis. Dkt. Nos. 43-8, 278:20-280:20; 43-20 at 45-46. Blanco forwarded Plaintiff's email to Waymon, Burns' direct supervisor, twelve minutes after receipt. Dkt. No. 43-10 at 64. Burns emailed Griffis, requesting her telephone number, less than an hour later. Dkt. No. 43-24 at 30. Plaintiff expressly told Griffis on April 16 that she "wanted [documents] to submit to the EEOC." Dkt. No. 43-8, 294:5-295:14. Griffis emailed Lariscy that another employee had reported that Plaintiff was gathering information to prove that she was being discriminated against. Dkt. No. 43-11 at 22.

At a minimum, Burns and Griffis were aware of Plaintiff's complaint.

Plaintiff also satisfies part of the causation analysis. Plaintiff's filing of her EEOC Intake Questionnaire was a protected act. Plaintiff notified GDHS Commissioners shortly thereafter. That she was terminated only a few weeks later establishes prima facie causation.[17]

But the causation analysis does not end with timelines. Defendants argue that Plaintiff's contact with Enterprise broke the causation circuit. Dkt. No. 43-1 at 20. The Court agrees. Plaintiff obtained information to which she was not entitled using her status as a government office manager. This was an adequate basis for her termination, and without evidence showing it to have been mere pretext, it authorizes granting summary judgment for Defendants. See Hills v. Savannah River Util. Co., No. CV 412-120, 2014 WL 4267486, at *3 (S.D. Ga. Aug. 27, 2014) (granting summary judgment: "[O]nce an employer proffers a reason for an adverse employment action that might otherwise motivate a reasonable employer, the employee must rebut it. Merely quarreling with the wisdom of that reason does not suffice. Furthermore, an employer's legitimate, non-discriminatory reason for termination, even if based on a

---

[17] Plaintiff was demoted in March 2009 and transferred on October 1, 2009. The Court cannot infer causation from these time periods to the May 2010 termination.

AO 72A
(Rev. 8/82)

mistaken but reasonable belief, will not subject it to liability." (internal citation omitted)); Saripalli v. Tech. Coll. Sys. of Ga., No. CV 412-075, 2014 WL 6504771, at *3 (S.D. Ga. Dec. 11, 2013), adopted, 2014 WL 808005 (S.D. Ga. Feb. 28, 2014) (granting summary judgment: "[A]n employer's good faith, but incorrect, belief that an employee violated a work rule can constitute a nondiscriminatory reason for that employee's termination[.]" (citation and parenthetical omitted)).

The Enterprise incident also purges any inference that the jury would draw from the timeline. Intervening employee misconduct "break[s] the causal link between the protected conduct and the adverse employment action." Henderson v. FedEx Express, No. 10-15633, 2011 WL 4600721, at *4 (11th Cir. 2011) (per curiam) (unpublished opinion) (affirming grant of summary judgment); see also Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (affirming grant of summary judgment and explaining that plaintiff's intervening misconduct "eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination"); Schoebel v. Am. Integrity Ins. Co. of Fla., No. 8:14-CV-426-T-27AEP, 2015 WL 4231670, at *3 (M.D. Fla. July 10, 2015) (granting summary judgment in part).

Plaintiff attempts to resurrect her claim by arguing that Griffis and Lariscy actually decided to terminate her in March.

Dkt. Nos. 43-18, 65:13-66:17; 43-19, 80:12-81:19; 54 at 18-21. But there can be no inference of retaliation without a statutorily protected act. See, e.g. Butler v. Ala. Dept. of Transp., 536 F.3d 1209, 1212-13 (11th Cir. 2008). Plaintiff did not come under the protection of the Participation Clause until April 5, when she filed her EEOC Intake Questionnaire.

Besides, Plaintiff's theory is supported only by allegation, whereas Defendants' is backed by record evidence. See Shuler v. Bd. of Trs. Of Univ. of Ala., 480 F. App'x 540, 544 (11th Cir. 2012) (per curiam) (unpublished opinion) ("Bare and self-serving allegations are inadequate to carry the plaintiff's burden on summary judgment."). Between April 5 and April 12 or 14, Lariscy, Griffis, and Burns discussed Plaintiff. Their emails reflect frustration, but do not explicitly discuss termination. See, e.g., Dkt. Nos. 43-18, 49:21-50:14, 67:21, 71:3-9; 43-20 at 35-36. Lariscy did not recommend termination until April 16—after Plaintiff contacted Enterprise. Dkt. No. 43-11 at 22.

Plaintiff wants the Court to infer that the April 5 EEOC charge, of which Defendants learned on April 13, was the real cause of her May 4 termination. But her contact with Enterprise is the plainly evidenced reason, whereas retaliation is Plaintiff's mere conjecture. Such conjecture is not enough to survive summary judgment. See Schoebel, 2015 WL 4231670, at *3

AO 72A
(Rev. 8/82)

(explaining that "[w]here . . . circumstantial evidence supports an inference of fact, i.e. causation, but direct evidence proves the contrary, the inference has been shown to be unreasonable").

In light of Plaintiff's act of intervening misconduct, she has failed to prove causation, and thus her prima facie case for retaliation fails and the McDonnell Douglas inquiry ends. Summary judgment is **GRANTED**.

**II.  Claims against Lariscy Are Barred by Qualified Immunity**

Lariscy is protected by qualified immunity.  This defense offers "complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

A public official must prove that she was acting within the scope of her discretionary authority at the time of the alleged wrongful acts.  Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012).  Lariscy did so.  She was human resources director and Plaintiff complains of human resources decisions.

The burden shifts to Plaintiff to show that qualified immunity does not apply.  Vinyard, 311 F.3d at 1346.  The Court assesses whether: (1) the plaintiff alleged facts to establish that the defendants violated a constitutional right; and (2)

AO 72A
(Rev. 8/82)

that right was clearly established. Pearson v. Callahan, 555 U.S. 223, 232 (2009).[18] A constitutional right is clearly established if "a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Plaintiff argues that Lariscy violated her constitutional rights. See generally Compl. Lariscy was clearly involved in making decisions regarding Plaintiff's employment. But she did not violate Plaintiff's clearly established rights:

Lariscy denied Plaintiff pay supplements and a rental car, but there is no evidence that she did so from racial animus.

Lariscy participated in Plaintiff's reassignment. But Lariscy recommended Plaintiff—who had had significant difficulties working in Liberty County—for the McIntosh County vacancy, describing her as an experienced office manager. Dkt. No. 43-18, 33:20-34:22. When Lariscy transferred Plaintiff to work with Holmes, Lariscy believed that Holmes' leadership style would jibe well with Plaintiff. Dkt. No. 43-25, 38:3-14. Any reasonable juror would conclude that Lariscy tried to resolve Plaintiff's complaints and workplace difficulties by transferring her to work under a supervisor who was a better match—not that Lariscy retaliated against Plaintiff for complaining to upper-level management.

---

[18] Courts can address either prong first. See Pearson, 555 U.S. at 236.

AO 72A
(Rev. 8/82)

Even toward the end, Lariscy counseled Griffis to apply progressive discipline and help Plaintiff. Dkt. No. 43-18, 39:17-40:13. It was only after Plaintiff contacted Enterprise that Lariscy decided to terminate her. Dkt. No. 43-11 at 22. There is no evidence that Plaintiff's complaints of racial discrimination against Adams, and her challenge to Chamberlin's handling thereof—which occurred fifteen months earlier—motivated Lariscy's decision.

Lariscy is thus entitled to qualified immunity. Accordingly, Defendant's Motion for Summary Judgment is **GRANTED**.

## CONCLUSION

For the reasons herein, Defendants' Motion for Summary Judgment is **GRANTED**. Dkt. No. 43. Given the untimeliness of Plaintiff's reassignment and demotion claims, summary judgment as to them is appropriate. Plaintiff failed to prove a prima facie case of retaliation because her misconduct—contacting Enterprise under false pretenses and abusing her public position in doing so—broke the inferred causal connection between the filing of her EEOC charge and her termination. Qualified immunity protects Lariscy in her individual capacity.

The Clerk of Court is **DIRECTED** to enter the appropriate judgment.

AO 72A
(Rev. 8/82)

**SO ORDERED**, this 8th day of November, 2016.


LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)